**E-FILED on** _5/23/05_

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| EMPLOYERS INSURANCE OF WAUSAU, an Wisconsin company,<br><br>      Plaintiff,<br><br>   v.<br><br>AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, an Alaska corporation,<br><br>      Defendant. | No. C-02-04976 RMW<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

This action was tried by the undersigned from September 13, 2004 to September 21, 2004. Plaintiff Employers of Wausau ("Wausau") was represented by its counsel, Malcolm A. Misuraca and Marlis McAllister. Defendant American International Specialty Lines Insurance Company ("AISLIC") appeared through its counsel, John L. Winchester III. The court has heard and evaluated the evidence, has considered the arguments of counsel and now issues its Findings of Fact and Conclusions of Law.

## I.  FINDINGS OF FACT

**A.    Nature of Case**

   1.    This is an action for declaratory relief, contractual contribution, and equitable contribution by one insurer against another. Plaintiff Wausau and defendant AISLIC both insured Nu-kote

1  International, Inc. ("Nu-kote").  Nu-kote manufactured and sold replacement ink cartridges and refills for
2  printers, fax machines and copiers.

3    2.  Plaintiff Wausau issued, and subsequently renewed, a $1 million primary
4  Comprehensive General Policy ("CGL policy") to Nu-kote, covering the period from April 1, 1992 through
5  March 31, 1994.  The original policy and the renewal have an endorsement that added "patent
6  infringement" to the list of offenses under the "advertising injury" coverage.  The list of offenses also included
7  infringement of copyright and trademark.

8    3.  AISLIC agreed in a written binder on March 31, 1995 to issue a patent infringement
9  indemnity policy to Nu-kote with a $25 million limit.  This policy was canceled effective July 12, 1995.

10    4.  On April 3, 1995, without any prior notice to Nu-kote, Canon Computer Systems
11  filed a lawsuit against Nu-kote setting forth claims, among others, for patent infringement and trademark
12  and trade dress infringement.  On April 25, 1995, Seiko-Epson Corporation commenced an action against
13  Nu-kote on nearly identical allegations.  Nu-kote tendered the claims to Wausau and to AISLIC.  In
14  response to the tender, AISLIC reserved its rights.  Wausau accepted the tender and ultimately paid
15  $9,031,431.77 to defend Nu-kote in the *Canon v. Nu-Kote* lawsuit and $6,769,457.75 to defend the
16  *Seiko-Epson* suit.  In addition, Wausau paid $300,000 in indemnity to settle the *Seiko-Epson* action.

17    5.  After resolution of the underlying *Canon* and *Seiko-Epson* lawsuits, Wausau
18  brought this action against AISLIC on October 15, 2002 seeking contribution.  Wausau did not pursue at
19  trial a claim for contractual indemnity under the assignment of rights it received from Nu-kote and approved
20  by the Bankruptcy Court on July 3, 2000. Rather, it only claimed entitlement to contribution based upon
21  equitable considerations.

**B.  Nu-kote's Acquisition of the Wausau CGL Policy**

23    6.  Nu-kote obtained from Wausau a $1 million primary CGL policy and renewed
24  that policy with a combined coverage period from April 1, 1992 through March 31, 1994.  The original
25  policy and the renewal had a nonpremium endorsement that added patent infringement to the offenses
26  covered by its "advertising injury" liability coverage.  Other offenses covered included infringement of

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-02-04976 RMW

copyright and trademark. The Wausau policy appears to have had an annual premium of approximately $76,500.[1]

**C.    Nu-kote's Acquisition of the AISLIC Patent Infringement Indemnity Policy**

7.    In early 1995, AISLIC began an underwriting investigation for the potential issuance of a patent infringement indemnity policy to Nu-kote. The AISLIC underwriters included Yutain Gong and Anthony Codding. AISLIC's underwriters did not believe there were other patent infringement policies on the market. They did not believe that typical commercial general liability insurance policies covered patent infringement. At the end of the underwriting review, AISLIC agreed on March 31, 1995 in a written binder to issue to Nu-kote a $15 million patent infringement indemnity policy for a premium of $275,000.

**D.    Coverage Provided By Wausau's CGL Policy**

8.    The nonpremium endorsement on Wausau's CGL policy which provides coverage for "advertising injury" liability reads in relevant part:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "advertising injury" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may, at our discretion, investigate any offense which may result in . . . "advertising injury" and settle any claim or "suit" which may result . . . .

Ex. 4, endorsement GL2402. The endorsement adds "patent infringement" to the list of offenses under the "advertising injury" coverage. "'Advertising injury' means injury . . . arising out of one or more of the following offenses committed in the course of 'your advertising activities:' . . . *Infringement of* copyright, title, *trademark, patent* or slogan." *Id.* (Emphasis added).

9.    Wausau's CGL policy has an "Other Insurance" provision which reads:

> If other valid and collectible insurance is available to the insured for a loss we cover, . . . our obligations are limited as follows:
>
> a.    Primary Insurance
>
>     This insurance is primary except [inapplicable exception] . . . . If this insurance is primary, our obligations are not affected unless any of the other insurance is primary. Then we will share with all that other insurance by the method described in c. below.
>
> * * *
>
> c.    Method of Sharing

---

[1]    The evidence concerning the premium involved the estimated premium.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-02-04976 RMW

3

>    If all of the other insurance permits contribution by equal shares, we will follow this method also . . . .
>
>    If any of the other insurance does not permit contribution by equal shares, we will contribute by limits.

Ex. 4.

**E.     Coverage Provided By AISLIC's Patent Infringement Indemnity Insurance**

10.     The AISLIC policy is titled "Patent Infringement Indemnity Insurance" and in "claims made" form covering generally liability "FOR ONLY THOSE CLAIMS THAT ARE FIRST MADE AGAINST THE INSURED AND REPORTED IN WRITING TO THE COMPANY WHILE THE POLICY IS IN FORCE." Ex. 586, Cover Sheet. It covers Nu-kote as the named insured for a policy period of March 31, 1995 to March 31, 1996 with limits of $15,000,000 per claim and $15,000,000 in the aggregate with amounts incurred for legal defense reducing the limits. Declarations. The insured has a $100,000 self-retention for each claim. The premium was $275,000. The policy was canceled effective July 12, 1994.

11.     The insuring agreement of the AISLIC policy provides:

> This policy shall reimburse the **Insured** for all sums which the **Insured** shall become legally obligated to pay and shall have paid as **Damages** resulting from any **Claim** or **Claims** first made against the **Insured** . . . during the **Policy Period** . . . for any **Covered Infringement** caused by the manufacture, use, distribution, advertising or sale of a **Covered Product** committed by the insured . . . but only if such **Covered Infringement** occurs on or after the **Retroactive Date** (March 31,1995) and before the end of the **Policy Period** . . . .

*Id.* The coverage includes reimbursement for defense expenses: "With respect to any **Covered Infringement** . . . the Company shall: (1) reimburse the **Insured** for sums which the **Insured** shall have incurred and paid as **Defense Expenses** in the defense of **Claims** alleging **Covered Infringements** . . . ; and (2) have the right but not the duty to assume the defense of any **Claim** against the **Insured** . . . ." *Id.*

12.     The policy defines "covered infringement" as:

> any actual or alleged **Patent Infringement** caused by the manufacture, use, distribution, advertising or sale of a **Covered Product** where, as a condition precedent to the **Patent Infringement** being deemed **Covered Infringement,** if a reasonably prudent patent attorney familiar with the type of business in which the **Insured** is engaged would have conducted an **Infringement Search** and **Infringement Safeguarding** prior to:
>
>    (1) first manufacturing, using, distributing, advertising or selling the **Covered Product**, or
>    (2) the inception of this policy,

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-02-04976 RMW

then the **Insured** shall have done so.

*Id*. "Infringement Search" and "infringement safeguarding" are defined.

> **Infringement Search** means the careful review by a patent attorney or patent agent to determine whether manufacture, use, distribution, advertising or sale of a **Covered Product** that the **Insured** is about to first manufacture, use, distribute, advertise or sell would result in Patent Infringement.
>
> . . . **Infringement Safeguarding** means, subsequent to performing **Infringement Search**, concluding in good faith, by means of a written opinion prepared by a patent attorney retained or employed by the Insured, that the manufacture, use, distribution, advertisement or sale by the Insured of the proposed **Covered Product** either:
>
> (1) will not result in **Patent Infringement**; or
> (2) would result in **Patent Infringement** but for the fact that said patent attorney found to be invalid the patent(s) that would be infringed; or
> (3) would result in **Patent Infringement** and immediately the **Insured** either:
>
> > (a) designs around the **Patent Infringement** so as to avoid **Patent Infringement**, or
> > (b) purchases sufficient rights to the infringed patent through license, cross-license or assignment, so as to avoid **Patent Infringement**, or
> > (c) abandons the product prior to its manufacture, use, distribution, advertising or sale, and subsequently the **Insured** concludes in good faith, by means of a written opinion prepared by a patent attorney retained or employed by the Insured, that the **Insured's** action pursuant to one or more of the above sub-paragraphs 2.g(3)(a), (b) and (c) is sufficient such that subsequent manufacture, use, distribution, advertisement or sale by the insured of the proposed **Covered Product** will not result in **Patent Infringement**.

*Id.* at 4-5. "**Damages** means monetary sums paid to a claimant pursuant to either judgments, or settlements negotiated with the written consent of the Company . . . ." *Id.* at 4.

      13.    The AISLIC policy requires AISLIC to pay only for those amounts in excess of the Nu-kote's self-retention of $100,000.

**RETENTION**

The Company shall be liable only for those amounts payable hereunder in satisfaction of judgments, settlements, Defense Expense and Injunction Expense which are in excess of the applicable retention stated in Item 5 of the Declarations. The retention shall apply to each Claim or Injunction Claim and shall be borne by the Insured and remain uninsured by the Company and not insured by any other insurer. Claims or Injunction Claims arising out of the same Covered Infringement shall be subject to only one retention.

*Id.* at 8. The policy also has a provision calling for Nu-kote to pay five percent of any damages or

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-02-04976 RMW

defense expense in excess of the retention amount and for that the coinsurance percentage to be borne by Nu-kote and not be insured.

**COINSURANCE**

The Insured shall be liable to pay the coinsurance percentage (six percent) of Damages, Defense Expense . . . in excess of the retention amount stated in Item 5 of the Declarations . . .The Company shall be liable to pay the remainder . . ., it being a condition of this insurance that thhe coinsurance percentage shall be borne by the insured at its own risk and be uninsured.

*Id.*

14. The AISLIC policy has an "Other Insurance" provision.

**OTHER INSURANCE**

Subject to the provisions of Section 4, LIMITS OF LIABILITY, sub-paragraph f, this policy shall be excess over any other valid and collectible insurance or indemnification agreement available to the **Insured**, whether such insurance or indemnification agreement is stated to be primary, pro-rata, contributory, excess, contingent or otherwise; however, this clause shall not apply to other insurance written specifically as excess over the limits of liability of this policy.

*Id.*

15. The AISLIC policy contains exclusions.

**EXCLUSIONS**

This policy does not apply to any **claim:**

\* \* \*

 j. not arising out of a **Covered Product**;

 k. arising from the violation of any right in non-patented intellectual property, including but not limited to any right in trademark, tradedress, copyright or trade secret;

\* \* \*

 n. arising out of the manufacture, use, distribution, advertising or sale of any **Covered Product**, which any **Insured**, prior to the effective date of this policy, knew or with the advice of patent counsel could have reasonably foreseen would result in **Patent Infringement;**

\* \* \*

*Id.*

**F.** ***Canon* and *Seiko-Epson* Litigation**

16. The *Canon* and *Seiko-Epson* lawsuits involved claims of trademark and trade dress

1  infringement as well as claims of patent infringement. Wausau defended Nu-kote. It did not reserve its
2  rights as to the patent infringement claims, although it denies that patent infringement could have arisen out
3  of Nu-kote's advertising activities. Wausau acknowledges that it had a duty to defend the lawsuits because
4  they claimed trademark and trade dress infringement arising out of Nu-kote's advertising activities. The
5  majority of the defense work was devoted to the patent claims. In the early stages of the cases, Nu-kote
6  redesigned its packages and labeling which appears to have essentially mooted the trademark and trade
7  dress claims. Wausau, however, never segregated the defense costs that were attributable to the patent
8  infringement claims or those that Wausau believes fell under the coverage of the AISLIC policy.

9        17.      Nu-kote's counsel in a letter sent on August 10, 1995 to Jeffrey Hutcheson,
10 Liability Claim Specialist for Wausau, asked for a prompt decision on Nu-kote's tender and set forth a list
11 of the Nu-kote products at issue, the products' release dates and the insurance policies in force. The
12 AISLIC policy was not listed.

13       18.      Wausau paid $300,000 to facilitate the settlement of the *Canon* case. No consent was
14 was sought or obtained from AISLIC for the settlement. However, no prejudice was suffered by AISLIC
15 from the failure to provide notice. The $300,000 settlement payment cut off the potential for incurring
16 substantially more than that in additional defense costs.

17       19.      Nu-kote did not perform an "infringement search" or "infringement safeguarding" as
18 specified in the AISLIC policy. No witness testified that Nu-kote had a patent attorney or agent conduct
19 an infringement search prior to the first manufacturing, use, distributing, advertising or selling of the accused
20 product or do so at the inception of coverage under the ASLIC policy. No written opinion prepared by a
21 patent attorney was received in evidence.[2] However, when conducting her underwriting investigation for
22 the AISLIC policy, Gong reviewed the Nu-kote safeguarding procedure and found it "good."

23       Q.      What did you conclude during the underwriting before the binder was
              issued about Nu-kote's attitude toward intellectual property?
24
      A.      Based on my notes I liked them. I think their management is sensitive
25               to the issue.

26 ――――――――――

27    [2]      An objection was sustained to the admission of some purported opinions rendered after the commencement of the *Canon* and *Epson-Sieko* lawsuits based upon failure to disclose those opinions prior
28 to trial.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-02-04976 RMW

|   |   |   |
|---|---|---|
| 1 | Q. | What did you think about their safeguarding procedure? |
| 2 | A. | I thought it was good. |
| 3 | Q. | Was the safeguarding procedure in writing? |
| 4 | A. | Yes. I thought it was good. |

Depo. of Gong, 40:10-20

20. Three days after AISLIC issued its binder on March 31, 1995, Canon sued Nu-kote on a variety of claims including patent infringement. AISLIC immediately cancelled the binder. Nu-kote protested the cancellation and held meetings with AISLIC to prove that Nu-kote did not know that the *Canon* suit was coming.

21. The discussions at the meetings included a series of questions to Nu-kote from AISLIC, which asked whether Nu-kote had adhered to its internal patent search and safeguarding procedure. AISLIC did not question whether Nu-kote had adhered to the search and safeguarding procedure set forth in the ASLIC policy. AISLIC rather inquired as to whether Nu-kote had adhered to its own procedure but did not inquire as to the substance of that procedure. When these meetings were concluded, AISLIC reinstated the patent infringement policy.

22. At trial, Karl Limbach, an experienced and well qualified patent attorney, testified that a reasonable patent attorney would have conducted an infringement search and safeguarding as described in the AISLIC policy, particularly in light of the industry involved.

23. A marketing brochure that AISLIC printed in June 1995, approximately three months after AISLIC bound coverage, includes a "Patent Infringement Insurance Fact Sheet." Ex. 32[3]. That sheet contains sections on "Product Highlights," "Underwriting Information Requirements" and "Customer Profile." It also includes a "Patent Risk Management" self-assessment guide as "an aid in formulating, implementing and maintaining an effective patent risk management policy." The brochure did not say that coverage is conditioned on the insured's having done a particular infringement search or undertaken safeguarding.

---

[3] The court took under submission the objection to the admissibility of the brochure (Ex. 32). The court finds that a sufficient foundation was laid to authenticate the brochure as an AISLIC brochure prepared in June 1995. Its relevance is limited to the light it sheds on underwriting intent and the materiality of the Patent Infringement Search and Safeguarding condition.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-02-04976 RMW

**G.    AISLIC's Reservation of Rights Letters**

24.    On November 29, 1995 AISLIC's counsel sent essentially identical reservation of rights letter to Nu-kote pertaining to the *Canon* and *Seiko-Epson* lawsuits.  The letters, among other things, state that to the extent "coverage may be available under the terms and conditions to the policy, such coverage would be limited to damages arising from only such Coverage Infringements which may have occurred . . . between March 31, 1995 and July 12, 1995."  Ex. 28.  The letter further points out (1) that any claim is subject to a 5% co-insurance; (2) that there is no coverage for trademark infringement, unfair competition or trademark dilution; (3) the definition of "covered infringement"; (4) that pursuant to the co-insurance provision the coverage "is excess over' . . . any other valid and collectible insurance or indemnification agreement available to the Insured, whether such insurance or identification agreement is stated to be primary, pro-rata, contributory, excess, contingent or otherwise. . .'"; and (5) that the policy "is not a defense policy and that AISLIC has no obligation to reimburse defense expenses prior to the final disposition of any claim."  *Id.*

25.    AISLIC now contends that there is no coverage under the AISLIC policy for a number of reasons:

(1) the Wausau policy is primary and AISLIC's policy is excess and has never been triggered;

(2) the requirements of the "Covered Infringement" provisions of AISLIC's policy have never been satisfied;

(3) the requirements of the self-insured retention provisions of the AISLIC policy have never been satisfied;

(4) the consent terms of the AISLIC policy were not met;

(5) the requirement that the insured pay defense expenses has not been met;

(6) the coinsurance condition of the AISLIC policy was not satisfied;

(7) the exclusions under the AISLIC policy prohibit a finding of coverage; and

(8) the statute of limitations has run on Wausau's claim for equitable contribution.

## II. CONCLUSIONS OF LAW

**A.    Excess Versus Primary Insurance**

1.    A primary carrier who pays the defense costs or pays the loss is entitled to

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-02-04976 RMW

equitable contribution from other primary carriers.

> [W]here two or more insurers independently provide primary insurance on the same risk for which they are both liable for any loss to the same insured, the insurance carrier who pays the loss or defends a lawsuit against the insured is entitled to equitable contribution from the other insurer or insurers . . . .

*Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal. App. 4th 1279, 1289 (1998). Wausau acknowledges that it provided primary coverage to Nu-kote[4] but claims that it is entitled to equitable contribution from AISLIC as the AISLIC policy "has all the objective indicia of a primary policy, despite the effort to characterize itself otherwise." Wau.'s Rev. Prop. F & C ¶ 37.

    2.    AISLIC argues that it was solely an excess insurer and, therefore, has no obligation to reimburse Wausau for any of the amount Wausau paid as defense costs or indemnity on behalf of Nu-kote.

> In the context of liability insurance, a primary insurer generally has the *primary* duty to defend and to indemnify the insured, unless otherwise excused or excluded by specific policy language. Excess insurance provides coverage after other identified insurance is no longer on the risk. "Excess" coverage means "coverage whereby, *under the terms of the policy,* liability attaches only after a predetermined amount of primary coverage has been exhausted."

*Fireman's Fund*, 65 Cal. App. 4th at 1305 (internal citations omitted). "[A] true excess insurer--- one that is solely and explicitly an excess insurer providing only secondary coverage---has no duty to defend or indemnify until all the underlying primary coverage is exhausted . . . ." *Id.*

    3.    AISLIC argues its policy contains three features which establish that it was only an

---

[4] The parties agree that Wausau was required to defend the *Canon* and *Seiko-Epson* lawsuits because they asserted claims covered under the advertising injury coverage for trademark infringement. Because the suits alleged covered claims, Wausau had the duty to defend the entire action. *See Buss v. Superior* Court, 16 Cal. 4th 35, 48 (1997).

The parties disagree whether Wausau also had a duty to defend because patent infringement is listed as a covered offense under the advertising injury endorsement. Wausau never reserved its rights as to patent infringement claims. However, as Wausau now argues, the California Supreme Court held in *Bank of the West v. Superior Court*, 2 Cal. 4th 1254 (1992) held that patent infringement could not occur in advertising because infringement at the time was the unauthorized production, sale or use of a patented product and not its advertisement. *See* 35 U.S.C. § 271(a) (1992).

AISLIC points out that patent infringement was added as a covered advertising offense in the Wausau policy after the decision in *Bank of the West*. Further, the endorsement was presumably intended to cover something. A persuasive argument can be made that the added patent infringement endorsement may have dispensed with the requirement that the infringement had to be the advertisement itself as opposed to the production, use or sale of the advertised patented product. *See International Communications Materials, Inc. V. Employer's Insurance of Wausau*, 1996 U.S. Dist. LEXIS 21825 (1996).

The court does not resolve the effect of Wausau's adding patent infringement as a covered advertising offense as resolution is not necessary to decide the case.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-02-04976 RMW

excess carrier. The policy: (1) is subject to a $100,000 self-insured retention, (2) does not impose a duty to defend, and (3) "only attaches to payments 'actually made' by the insured, and then only after 'final disposition' of the suit or claim." AISLIC's Prop. F & C, p. 8:17-18.

**Self-Insured Retention**

4. Although coverage under the AISLIC policy is subject to a self-insured retention, that does not necessarily mean that the ASLIC policy should be viewed as excess viz-a-viz the Wausau policy once the self-insured retention had been paid. AISLIC relies heavily on *National Union Fire Insurance Company of Pittsburg, P.A. v. Lawyers Mutual Insurance Company*, 885 F.Supp 202 (S.D. Cal. 1995) which held that a malpractice policy which provided coverage in excess of the self-insured retention of $250,000 was excess over a primary policy with limits of the amount of the self-insured retention ($250,000) and which included a duty to defend. The case settled for $200,000. The reasonable expectation of the insured in *National Union* was clear---it intended the primary policy to cover the defense and indemnity as to the self-insured retention. In contrast, in the instant case, the self-insured retention was paid and, assuming covered infringements under the AISLIC policy, there is nothing, except a boilerplate co-insurance clause, that suggests that AISLIC's obligation to pay defense costs and indemnity was intended to be secondary to Wausau's obligation. In other words, the AISLIC policy should not be viewed as excess viz-viz the Wausau policy.

5. AISLIC argues that the presence of a self-insured retention makes a policy "excess." *See, e.g., Pacific Employer's Ins. Co. v. Domino's Pizza Inc.*, 144 F.3d 1270, 1276-77 (9th Cir. 1998) ("policies which are subject to self-insured retentions are 'excess policies' which have no duty to indemnify until the self-insured retention is exhausted."). The question, however, is excess to what. In *Domino's Pizza* the coverage terms explicitly stated that coverage was in excess of the amount of the self-insured retention and coverage provided by other designated policies. *Id.* at 1277. The court did not hold that the mere presence of a self-insured retention makes an indemnity policy excess viz-a-viz another carrier which provides primary coverage.

6. If the *Canon* and *Seiko-Epson* claims involved covered infringements under the ASLIC policy, the ASLIC and Wausau policies should both be considered as providing primary coverage once Nu-kote's self-insured retention was exhausted. That conclusion is consistent with the reasonable

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-02-04976 RMW

11

expectations of both AISLIC's underwriter and the insured, Nu-kote, as suggested by underwriting considerations and the policy language. The ASLIC policy was presumably drafted and underwritten with the knowledge that Nu-kote had CGL coverage as would most potential insureds who would be interested in a patent infringement indemnity policy. Nevertheless, the ASLIC policy makes no mention of underlying insurance and contemplates that the insured's self-retention will not be covered by insurance. However, the ASLIC policy was apparently underwritten on the assumption that standard CGL policies do not cover the risk of patent infringement. Therefore, the fact that Nu-kote did not pay the self-insured retention is of no consequence.

7. The reasonable expectation of an insured, such as Nu-kote, under AISLIC's policy would be that the policy provides indemnity for defense costs and loss suffered as a result of a claim of patent infringement. The policy in bold print on page 1 has the title "**PATENT INFRINGEMENT INDEMNITY INSURANCE**" and sets forth its coverage: "This Policy shall reimburse the **Insured** for all sums which the **Insured** shall become legally obligated to pay and shall have paid as **Damages** resulting from any **Claim** or **Claims** first made against the **Insured** . . . during the **Policy Period** . . . for any **Covered Infringement** . . . . ." (AISLIC policy, p. 1). If the AISLIC policy were truly intended to be an excess policy over underlying insurance, some language to that effect should have been set forth in the insuring agreement. Further, it seems unlikely that an insured, such as Nu-kote, would purchase a patent infringement policy if it thought that it had coverage under its CGL policy.

**Lack of Duty to Defend**

8. AISLIC also argues that its policy only provides excess or secondary coverage because it does not carry a duty to defend, and a duty to defend is "[o]ne of the hallmarks of 'primary' (as distinct from secondary, contingent, or excess insurance). . . ." (D's Prop. F & C, p.8). AISLIC is correct that primary liability policies usually contain a duty to defend. That does not mean, however, that an indemnity policy that provides for reimbursement for defense costs is necessarily an excess policy. *Signal Co.'s v. Harbor Ins. Co.*, 27 Cal. 3d 359 (1980), cited by AISLIC, says that if a policy explicitly provides that its coverage will not attach until the primary coverage has been exhausted and the primary coverage includes a defense obligation, the policy is an excess policy and the carrier has no duty to defend until the primary coverage has been exhausted. Here, AISLIC has no duty to defend and does not have an obligation to

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-02-04976 RMW

indemnify until the claim has been resolved and the self-insured retention exhausted. However, once the conditions for indemnity have been met, the AISLIC policy says nothing, except in a boilerplate other insurance provision that attempts to make the policy excess to any other insurance or indemnification agreement, suggesting it has no duty to equitably contribute to the payment of defense costs if another carrier paid the defense costs in full. If AISLIC were able to avoid any obligation for defense costs for the defense of a covered patent infringement claim merely because of the fortuitous existence of a policy like Wausau's, AISLIC would escape an obligation for which Nu-kote paid a premium. AISLIC would thereby realize a windfall at the expense of Wausau. "Other insurance" clauses, such as contained in the AISLIC policy, are disfavored and the modern trend is to require equitable contribution regardless of the type of "other insurance" clause in the policies. *See, e.g., Dart Industries, Inc. v. Commercial Union Ins. Co.*, 28 Cal.4th 1059, 1079-80 (2002). Further,

> the reciprocal rights and duties of several insurers who have covered the same event do not arise out of contract, for their agreements are not with each other. . . . Their respective obligations flow from equitable principles designed to accomplish ultimate justice in the bearing of a specific burden. As these principles do not stem from agreement between the insurers their application is not controlled by the language of their contracts with the respective policy holders.

*Signal Co.'s*, 27 Cal. 3d at 369 (quoting *Amer. Auto Ins. Co. v. Seaboard Surety Co.*, 155 Cal.App.2d 192, 195-96 (1957)).

**Indemnity Obligation Only Attaches to Payments "Actually Made" by the Insured and Only after Final Disposition of the Claim**

9.   AISLIC submits that since its policy requires payment by Nu-kote of its self-insured retention before any payment obligation on AISLIC's part arises and since the AISLIC policy's co-insurance provision says that "this policy shall be excess over any other valid and collectible insurance or indemnification agreement available to the **Insured**," the AISLIC policy is an excess policy. As discussed above, AISLIC and Wausau both had obligations to pay defense costs. The fact that the AISLIC policy does not require payment until a claim is resolved does not mean that its obligation was negated because Wausau supplied a defense and paid for that defense on an on-going current basis. The court has found no authority supporting the proposition that a liability carrier that fulfills its obligation to provide a defense thereby extinguishes an indemnity carrier's obligation to reimburse for defense costs.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-02-04976 RMW

**B.     The Covered Infringement Requirement**

10.     Although the right to contribution does not arise out of contract---coinsurers' respective obligations flow from equitable principles designed to accomplish justice in bearing the burden of the loss involved---an insurer cannot be asked to contribute if it does not cover the loss.

> One of the firm principles undergirding the doctrine of equitable contribution is that two or more insurers share an *obligation* to the common insured. Every California case of which we are aware has enforced an insurer's contribution claim only where the other insurer was also obligated to pay on the claim.

*American Continental Insurance Co. v. American Casualty Company*, 86 Cal.App.4th 929, 937 (2001); *see Truck Insurance Exchange v. Unigard Insurance Company*, 79 Cal.App. 4th 966, 974 (2000) ("[A]bsent compelling equitable reasons, courts should not impose an obligation on an insurer that contravenes a provision in its insurance policy.").

11.     AISLIC contends that it did not provide coverage because neither the *Canon* nor *Sieko-Epson* lawsuit involved a "Covered Infringement," a condition precedent to coverage under the AISLIC indemnity policy. Since a patent attorney familiar with the type of business in which Nu-kote engaged did not do an "infringement search" and "infringement safeguarding" with respect to the accused products, AISLIC contends that the alleged infringements were not "covered infringements" under the AISLIC insuring agreement.

12.     Wausau maintains that ASLIC waived the search and safeguarding procedures set forth in the AISLIC policy.

13.     To fall within AISLIC's coverage, the claims made in the *Canon* and *Epson* litigations must have involved covered infringements which means that, as a condition precedent to coverage, Nu-kote must have conducted an infringement search and infringement safeguarding prior to its first manufacturing, using, distributing, advertising or selling the product or at the inception of the policy, if a reasonably prudent patent attorney familiar with the type of business in which Nukote was engaged would have done so.

14.     Wausau produced no evidence to indicate Nu-kote ever complied with the patent search and safeguarding provisions of the AISLIC policy. Wausau offered no evidence on whether a reasonably prudent patent attorney would or would not have conducted, or did or did not do, an

infringement search or safeguarding on the products at issue prior to first manufacturing, using distributing, advertising, or selling those products or at the inception of the policy. In fact, no evidence was admitted which showed whether patent searches had ever been conducted (even in the face of corporate policy to do so) or written opinions obtained.

15. AISLIC's patent expert, Mr. Limbach, explained that a reasonable patent attorney in the business of Nu-kote would have conducted an infringement search and safeguarding. Wausau did not sustain its burden that Nu-Kote met the coverage requirement of the AISLIC policy.

**Waiver**

17. Wausau, however, asserts that AISLIC waived the patent safeguarding requirements of its policy. It argues that Wausau says that AISLIC did so by: (1) accepting Nu-kote as an insured after its underwriting investigation of Nu-kote which included a review of Nu-kote's internal safeguarding procedures; (2) knowing that Nu-kote had products on the market at the time the policy was issued and thus Nu-kote would not have conducted the search and safeguarding procedures in the policy unless, by coincidence, they were the same as Nu-kote's existing procedures; and (3) reinstating the AISLIC indemnity policy after it initially cancelled the binder following the institution of the *Canon* suit. Wausau further argues that the search and safeguarding procedure set forth in the AISLIC policy could not have been viewed as critical by AISLIC as its marketing brochure, although discussing a prospective insured's own internal procedures, did not mention the search and safeguarding procedures contained in the policy. AISLIC's patent infringement policy brochure dated in June, 1995 (a date well after the Nu-Kote policy was bound and incepted) makes no mention of the patent safeguarding requirement of the policy; (2) AISLIC, prior to issuing its policy, reviewed Nu-Kote's corporate policy on patent searches and expressed no disapproval of it; and in fact, described it as "good"; and (3) AISLIC reinstated its policy, after initially canceling it upon learning of the *Canon* suit.

18. AISLIC did review Nu-kote's safeguarding procedure during its underwriting investigation of the risks of issuing a patent indemnity policy to Nu-kote. The underwriters' description of Nu-kote's policy as "good," however, does not equate to a relinquishment of a requirement of the policy.

Nu-kote's corporate policy might well have been "good," but not in accordance with AISLIC's requirements.

19. Wausau argues that AISLIC waived the policy's search and safeguarding provisions because it knew that Nu-kote had products on the market at the time the policy was issued and, therefore, Nu-kote would not have conducted the search and safeguarding procedures in the policy unless, by coincidence, they were the same as Nu-kote's existing procedures. However, Wausau overlooks that the policy allowed Nu-kote to do its infringement search and infringement safeguarding either (1) before first manufacturing or selling the product, "*or (2) the inception of this policy*." (Ex. 586) (emphasis added). Thus, Nu-kote, although it apparently did not do so, could have performed the search and safeguarding as required by the policy when it first reviewed the coverage offered by AISLIC.

20. The search and safeguarding provision of the AISLIC policy does narrowly define those infringement claims that are covered. However, the provision was obviously designed to substantially reduce exposure to AISLIC and thus presumably allowed AISLIC to charge Nu-kote a lower premium than it would have charged absent the safeguarding provision. Further, before AISLIC issued its binder, the coverage language was apparently provided to Nu-kote for its attorney's review to determine whether Nu-kote wanted to have the coverage.

21. AISLIC's sales brochure for its patent infringement indemnify policy, which was distributed approximately three months after AISLIC's policy was issued to Nu-kote, does not expressly highlight the search and safeguarding coverage requirements. However, AISLIC is neither required nor necessarily should be expected to have included every condition of its indemnity policy in its advertising material.

22. Nothing AISLIC said to Nu-kote when AISLIC agreed to reinstate the policy after initially cancelling the binder because it believed, among other things, that Nu-kote must have had prior knowledge of the *Canon* claim prior to the issuance of the binder, relinquished the search or safeguarding or other coverage requirements of its policy.

23. The cases cited by Wausau do not support a waiver by AISLIC of its search and

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-02-04976 RMW

safeguarding provisions. *Intel Corp. v. Hartford Acc. & Ind. Co.* 952 F.2d 1551, 1559 (9th Cir. 1991) deals with an insurer's waiver of an exclusion not asserted in its letter denying the claim. In contrast, AISLIC reserved its rights as to the Patent Safeguarding requirement. Further, *Intel* found no waiver because there was no showing of reliance by the insured. "In cases where waiver has been found, there is generally some element of misconduct by the insurer or detrimental reliance by the insured." *Id.* at 1560. In the instant case, there was no prejudice to Nu-kote because the alleged waiver did not occur until Nu-kote was required to have completed its patent search and safeguarding. Nor was there any detrimental reliance by Nu-kote as its defense was entirely paid for by other insurance.

24. Neither does *B&E Convalescent Center,* 8 Cal.App. 4th 78, 86, n.7 (1992) assist Wausau. That case involved a declaratory relief, breach of contract, and bad faith action brought by B&E, the insured, against State Fund (the insurer) after State Fund refused to defend or indemnify B&E against a wrongful termination of employment action brought by one of B&E's former employees. B&E argued that State Fund failed to raise in its initial denial of coverage that the claim was not covered because the employee had alleged that her emotional injuries did not arise out of or in the course and scope of her employment. *Id.* at 86-87. The court stated that the mere failure to raise that ground in its denial of coverage letter was not enough to show waiver. B&E had failed to show that State Fund had intentionally relinquished its coverage position or that it (B&E) relied to its detriment on the failure to initially assert a reservation based upon scope of employment. *Id.* at 86, n.7.

25. Finally, *Owen v. American Home,* 153 F.Supp. 928 (N.D. Cal. 1957), also relied on by Wausau, involved the issue of whether the insurer could rely on a provision of a policy that excluded coverage for a watercraft with a motor in excess of ten horsepower. Plaintiffs' watercraft had a forty horsepower motor. The court found that the insurer could not do so because its agent had led the plaintiffs to believe that their watercraft would be covered, without any limitation on horsepower. The court held: "The law in California is clear that where an insurance agent gives a misleading, incorrect or incomplete answer, without qualification (even though, perhaps, carelessly made) to a specific question by the prospective insured concerning coverage, the insurer is not, after reliance has been placed thereon by the insured, allowed to deny liability on the basis of a provision which is contrary to, and does not truly reflect,

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-02-04976 RMW

the representations of the agent." *Id.* at 930. *Owen* is clearly distinguishable from the current case because there is no evidence that any agent of AISLIC's ever represented to Nu-Kote that it would not have to conduct the policy's patent search and safeguarding requirements.

26. The court concludes that AISLIC did not waive any of its coverage conditions.

> California courts will find waiver when a party intentionally relinquishes a right, or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished. The doctrine of waiver looks to "the act, or the consequences of the act, of one side only," in contrast to the doctrine of estoppel, which "is applicable where the conduct of one side has induced the other to take such a position that it would be injured if the first should be permitted to repudiate its acts."
>
> In the insurance context, however, the waiver doctrine has developed somewhat differently, and the distinction between waiver and estoppel has been blurred. In cases where waiver has been found, there is generally some element of misconduct by the insurer or detrimental reliance by the insured.
>
> * * *
>
> Federal cases applying California law also suggest such misconduct or reliance must be shown.

*Intel*, 952 F.2d at 1559-1560) (internal citations omitted); *see Waller v. Truck Ins. Exchange, Inc.*, 11 Cal.4th 1 (1995). Here, the evidence shows no "intentional relinquishment" by AISLIC of its rights under the policy, nor any conduct from which a reasonable insured could infer that it had done so. In fact, AISLIC's reservation of rights letter expressly points to the search and safeguarding portions of the policy and requests copies of any patent opinions. There was no evidence that any opinions were provided.

### C. Conclusion

27. Since AISLIC' was not obligated to pay on the *Canon* and *Epson-Seiko* claims because they did not involve "covered infringements," the court does not reach the additional issues raised by the parties. Wausau is not entitled to recover from AISLIC on an equitable contribution theory because AISLIC was not obligated to pay on the claim. Judgment will be entered in favor of Defendant American International Specialty Lines Insurance Company and against Employer Insurance of Wausau.

DATED:     5/23/05                                  /s/ Ronald M. Whyte
                                                    RONALD M. WHYTE
                                                    United States District Judge

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-02-04976 RMW

18

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff(s):**

| | |
|---|---|
| Malcolm A. Misuraca | mam@aliscafi.us |
| Philip C. Hunsucker | pch@reslawgrp.com |
| Bryan M. Barber | bbarber@larsonking.com |
| Jeffrey Cleary | jcleary@larsonking.com |
| Jesse F. Ruiz | jfr@r-winc.com |

**Counsel for Defendant(s):**

| | |
|---|---|
| Archie S. Robinson | asr@r-winc.com |
| Thomas R. Fellows | trf@r-winc.com |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/EC program.

**Dated:**     5/23/05                                    DOH
                                                          **Chambers of Judge Whyte**

FINDINGS OF FACT AND CONCLUSIONS OF LAW
C-02-04976 RMW